**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MARGARET MCNAMARA,

                                        Plaintiff,                          1:21-cv-1312 (BKS/DJS)

v.

COUNTY OF SARATOGA, SARATOGA COUNTY
BOARD OF SUPERVISORS, THEODORE KUSNIERZ,
individually and in his official capacity as Chairman of the
Saratoga County Board of Supervisors, and STEVE
BULGER, individually and in his official capacity as
Saratoga County Administrator,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Mark T. Walsh
Nancy S. Williamson
Christopher M. Silva
Kathryn D. Bobel
Gleason, Dunn, Walsh & O'Shea
300 Great Oaks Boulevard, Suite 321
Albany, NY 12203

*For Defendants County of Saratoga and Saratoga County Board of Supervisors:*
Timothy J. Lambrecht
Wladis Law Firm, P.C.
P.O. Box 245
Syracuse, NY 13214

*For Defendant Theodore T. Kusnierz, Jr.:*
William J. Dreyer
Stacy S. Mix
Dreyer Boyajian LLP
75 Columbia Street
Albany, NY 12210

*For Defendant Steve Bulger:*
Michael E. Ginsberg
Rhiannon I. Gifford

Pattison Sampson Ginsberg & Griffin, PLLC
P.O. Box 208
22 First Street
Troy, NY 12181

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Margaret McNamara brings this action against Defendants County of Saratoga (the "County"), County Board of Supervisors (the "County Board" and, together with the County, the "County Defendants"), Theodore Kusnierz, and Steve Bulger, alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; the New York State Executive Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; and 42 U.S.C. § 1983. (Dkt. No. 4 (Amended Complaint)). Plaintiff alleges: (1) Title VII claims against the County Defendants for hostile work environment (motivated by gender bias and retaliation) and retaliation (First, Second, and Third Causes of Action); (2) NYSHRL claims against all Defendants for gender discrimination, harassment, and retaliation and against Defendants Kusnierz and Bulger for aiding and abetting gender discrimination, harassment, and retaliation (Fourth Cause of Action); and (3) a § 1983 claim against Defendant Kusnierz for violating Plaintiff's right to equal protection under the Fourteenth Amendment (Fifth Cause of Action). (*Id.*).

On February 26, 2024, the County Defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 51). Defendants Kusnierz and Bulger filed separate motions for summary judgment that same day. (Dkt. Nos. 52–53). Plaintiff opposes all three motions. (Dkt. No. 58). For the following reasons, Defendants' motions for summary judgment are granted in part and denied in part.

## II.     FACTS[1]

### A.     The Parties

The County is a county organized and existing under the laws of the State of New York. (Dkt. No. 51-20, ¶ 1; Dkt. No. 58, ¶ 1). The County Board is the legislative and executive authority of the County government and oversees most County departments and programs. (Dkt. No. 51-20, ¶¶ 2, 8; Dkt. No. 58, ¶¶ 2, 8). The County Board supervises the official conduct of County officers and employees, controls all County property, enacts ordinances, sets salaries, conducts public meetings, and generally oversees County operations and business. (Dkt. No. 51-20, ¶ 8; Dkt. No. 58, ¶ 8).

The County Board is comprised of twenty-three Supervisors representing the nineteen towns and two cities within the County, (Dkt. No. 51-20, ¶ 6; Dkt. No. 58, ¶ 6), and is governed by a Chairman elected by the Supervisors at the beginning of each year, (Dkt. No. 51-20, ¶ 9; Dkt. No. 58, ¶ 9). The vote of each Supervisor is accorded a weight in proportion to the population of the city or town he or she represents. (Dkt. No. 51-20, ¶ 7; Dkt. No. 58, ¶ 7).

The County Board makes personnel decisions when required by law. (Dkt. No. 51-20, ¶ 11; Dkt. No. 58, ¶ 11). There are twenty-five County positions appointed by the County Board, (Dkt. No. 51-20, ¶ 11; Dkt. No. 58, ¶ 11), one of which is the Director of Human Resources (the "HR Director"), who is appointed to a six-year term, (Dkt. No. 51-20, ¶ 13; Dkt. No. 58, ¶ 13).

---

[1] The facts are drawn from the County Defendants' statement of material facts, (Dkt. No. 51-20), Defendant Kusnierz's statement of material facts, (Dkt. No. 52-3), Defendant Bulger's statement of material facts, (Dkt. No. 53-8), Plaintiff's responses to Defendants' statements of material facts and Plaintiff's statement of additional material facts, (Dkt. No. 58), and Defendants' responses to Plaintiff's statement of additional material facts, (Dkt. Nos. 62-1, 63-1, 64-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Defendant Kusnierz was a member of the County Board and Supervisor for the Town of Moreau from January 1, 2018, until December 31, 2023. (Dkt. No. 51-20, ¶ 3; Dkt. No. 58, ¶ 3). On January 6, 2021, Defendant Kusnierz was elected Chairman of the County Board. (Dkt. No. 51-20, ¶ 3; Dkt. No. 58, ¶ 3). He served in that role until December 31, 2023. (Dkt. No. 51-20, ¶ 3; Dkt. No. 58, ¶ 3).

Defendant Bulger is the County Administrator. (Dkt. No. 51-20, ¶ 4; Dkt. No. 58, ¶ 4). He was appointed to that role on January 6, 2021. (Dkt. No. 51-20, ¶ 4; Dkt. No. 58, ¶ 4).

Plaintiff is the County's former HR Director. (Dkt. No. 51-20, ¶ 5; Dkt. No. 58, ¶ 5). She was hired by the County in 2009, (Dkt. No. 58, ¶ 68; Dkt. No. 62-1, ¶ 68; Dkt. No. 63-1, ¶ 68; Dkt. No. 64-1, ¶ 68), and appointed as HR Director on May 29, 2015, (Dkt. No. 51-20, ¶ 5; Dkt. No. 58, ¶ 5). She served a six-year term as HR Director, ending on May 22, 2021, (Dkt. No. 51-20, ¶ 5; Dkt. No. 58, ¶ 5), though she remained in that role until July 23, 2021, as her replacement was unable to begin immediately, (Dkt. No. 51-20, ¶ 34; Dkt. No. 58, ¶ 34).

### B.    The Underlying Conduct

In her April 15, 2024 affidavit, Plaintiff states that Defendant Kusnierz "started engaging in hostile and aggressive behavior toward me" in 2018, shortly after he became a member of the County Board. (Dkt. No. 58-2, ¶ 6). "In 2020, Defendant Kusnierz blamed me for issues with his enrollment in the New York State and Local Retirement System ('NYSLRS') even though neither I nor the County Human Resources Department had any control over his registration submissions as those were handled between Defendant Kusnierz and the NYSLRS." (*Id.* ¶ 7). After this incident, Plaintiff continues:

> It became evidence to me that Defendant Kusnierz's hostility was directed at me based on my gender, as he engaged in the following continuing behavior:
>    a. Defendant Kusnierz consistently exhibited a dismissive attitude towards me at Board and committee meetings.

      b. Defendant Kusnierz regularly glared at me during meetings in an attempt to intimate [sic] and threaten me.
      c. Defendant Kusnierz exhibited a hostile and aggressive tone in telephone conversations with me and in person. This also made me feel threatened.
      d. Defendant Kusnierz singled me out during Board meetings by asking questions on insignificant issues, such as who gave me permission to send emails.

(*Id.* ¶ 9). According to Plaintiff, Defendant Kusnierz "did not treat male department heads with such disdain, hostility, or aggression." (*Id.* ¶ 10).

In March 2020, at the start of the COVID-19 pandemic, the County temporarily paid essential employees time-and-a-half for physically showing up at work. (Dkt. No. 51-20, ¶ 41; Dkt. No. 58, ¶ 41). The County Board unanimously passed a resolution approving this time-and-a-half plan at a meeting on March 17, 2020, (Dkt. No. 58-18, at 19), but the plan and the circumstances of its implementation became the subject of public criticism, and it is often referred to as the "Pandemic Pay Scandal," (Dkt. No. 51-20, ¶ 43; Dkt. No. 58, ¶ 43). As a County employee, Plaintiff did not vote on the resolution approving the plan. (Dkt. No. 58, ¶ 122; Dkt. No. 62-1, ¶ 122; Dkt. No. 63-1, ¶ 122; Dkt. No. 64-1, ¶ 122).

Plaintiff states that, as a result of the plan, "I erroneously received the additional compensation, along with other male management level employees who were not supposed to receive it. I, along with my similarly situated colleagues, returned the additional compensation." (Dkt. No. 58-2, ¶ 14). Plaintiff states further that on March 25, 2020, she explained to Defendant Kusnierz that she was not supposed to receive the additional compensation, (*id.* ¶ 15), but that later that same day, he "intentionally provided false information to the Times Union newspaper," (*id.* ¶ 16), which published an article stating:

      Kusnierz said he supports paying extra wages to those who are putting themselves and their families at risk, like public nurses. But he said it is "absolutely outrageous" to be paying, for example, the Director of Human Resources Marcy McNamara time-and-a-half. . . . "I'm whole supportive of our rank and file people

on the front lines working to combat and control the spread of the virus," Kusnierz said. " . . . Not those who I deem highly compensated individuals in management."

(Dkt. No. 52-2, at 95). Plaintiff recalls, "I was shocked, humiliated, and attacked by Defendant Kusnierz's false statement and the fact that [he] only mentioned me and not the male managers . . . who inadvertently and erroneously received the additional compensation, which we all returned to the County." (Dkt. No. 58-2, ¶ 17).

The next day, March 26, 2020, Plaintiff emailed the County Board "requesting that Defendant Kusnierz address all requests to Human Resources through the County Administrator, the County Chair, or the County Attorney." (Dkt. No. 52-2, at 38). In her email, "re: Human Resources," Plaintiff writes:

> I have never made a request like this during my professional career. At this moment, I am working non-stop to do my job and address all of the Human Resource issues related to the Covid 19 crisis. [Defendant] Kusnierz has been extremely offensive and retaliatory during our recent conversations. . . . I value my relationship with all of you and am available whenever to discuss the details.

(*Id.* at 38–39). Ten minutes later, Defendant Kusnierz replied: "[A]s a separate matter, since you brought up your job performance in relation to COVID19, I would be happy to discuss your job performance prior to the outbreak as well with any and all." (*Id.* at 38). A few minutes after that, Supervisor Willard Peck responded to Defendant Kusnierz's reply: "This line of discussion does nothing but undermine the positive work being done by our employees in Saratoga County, hurts morale and puts more lives in danger." (*Id.*). To which Defendant Kusnierz responded: "This discussion began with the employee. Perhaps someone should have a conversation with her if there is a sincere concern for morale." (*Id.*). Plaintiff states she received no other responses "to the concerns in my email." (Dkt. No. 58-2, ¶ 18).

Mr. Peck testified during his deposition that he was not surprised "[Plaintiff] was asking for someone to step in between her and [Defendant] Kusnierz." (Dkt. No. 58-9, at 44:17–21).

Mr. Peck "understood [Defendant Kusnierz's] behavior to intentionally bother [Plaintiff]," (*id.* at 50:6–9), and testified that Defendant Kusnierz's "aggressive and out of line" behavior toward Plaintiff "was an ongoing issue," (*id.* at 45:19–46:1). Mr. Peck stated that Defendant Kusnierz's "aggressiveness" toward Plaintiff "at every meeting" began in January 2020, (*id.* at 46:2–10), and that Defendant Kusnierz "started to call [Plaintiff] madame when he would publicly call her to speak at various meetings"—that he "went from calling her Director McNamara to calling her madame," (*id.* at 75:12–76:14).

Plaintiff states that after her March 26, 2020 email, "Defendant Kusnierz's hostile and aggressive conduct toward me became even more uncomfortable" and, "[b]ecause meetings occurred every week, I was subjected to this treatment every week." (Dkt. No. 58-2, ¶ 19). Plaintiff states further that at a meeting "full of Supervisors and County staff" on March 27, 2020, "Defendant Kusnierz condescendingly referred to me as 'madame;' yelled, screamed, and pointed at me; became red in the face and appeared agitated out of control; and called for my resignation." (*Id.* ¶ 20; *see also* Dkt. No. 58-9, at 72:1–4 (Mr. Peck testifying that when he stood up to conclude the meeting, "Kuznierz puts his speaker on and starts yelling into the microphone . . . pointing and screaming at Ms. McNamara . . . that he wanted her resignation")). Plaintiff recalls, "I felt physically threatened because of the way he exploded at me" and "felt humiliated and embarrassed because his conduct occurred in front of so many County employees and Supervisors." (*Id.* ¶ 21). After the meeting, Defendant Kusnierz told County Administrator Spencer Hellwig and then-Chairman of the County Board Preston Allen that "[Plaintiff] 'better apologize or this would not go away.'" (Dkt. No. 58, ¶ 156; Dkt. No. 62-1, ¶ 156; Dkt. No. 63-1, ¶ 156; Dkt. No. 64-1, ¶ 156).

Plaintiff states that at a meeting on April 21, 2020, "Defendant Kusnierz spewed another falsehood when he claimed I had told him that he would not get any information from my office." (Dkt. No. 58-2, ¶ 23). And after a different meeting, Plaintiff continues, "Defendant Kusnierz angrily approached me. I was immediately scared and felt threatened by the manner in which he was approaching me. The County Sheriff noticed Defendant Kusnierz's conduct during and after every meeting and physically stood in my office with me to ensure I felt protected." (*Id.* ¶ 24). Plaintiff adds, "[b]ecause of Defendant Kusnierz's conduct toward me, I sent my Deputy . . . to meetings in my place to avoid his public abuse, despite this being a crucial part of my job." (*Id.* ¶ 25).

Mr. Hellwig testified at his deposition that in his opinion "there was no question that Kusnierz was acting this way towards [Plaintiff] because she was a woman," (Dkt. No. 58-10, at 44:7–17):

> I never witnessed [Defendant Kusnierz] treating a male department head the way he was treating [Plaintiff]. In addition to that, there were three other women that he didn't treat with the same level of disdain, but he manhandled them and they were all department heads. They were management personnel. There just seemed to be a trend with him that related to females, females that were upper-level management.

(*Id.* at 44:22–45:7). At his deposition, Mr. Peck similarly testified that Defendant Kusnierz "was more aggressive with accomplished women than accomplished men," referring in particular to Defendant Kusnierz being "very aggressive" toward Director of Public Health Cathi Duncan, Deputy Director of Public Health Kathy Medic, and Plaintiff. (Dkt. No. 58-9, at 84:20–85: 6). And County Attorney Stephen Dorsey noted in response to a question at his deposition about whether he thought Defendant Kusnierz treated Plaintiff differently because of her gender, "I think, yes, he bullied her because he knew it had an effect on her." (Dkt. No. 58-11, at 96:13–16).

On April 28, 2020, Plaintiff filed a formal complaint with the County Attorney's Office, alleging sexual harassment by Defendant Kusnierz in violation of the County's Unlawful Workplace Harassment Policy. (Dkt. No. 51-20, ¶ 36; Dkt. No. 58, ¶ 36). Plaintiff filed the complaint before Defendant Bulger was appointed County Administrator on January 6, 2021, and the complaint does not allege that he engaged or participated in or had knowledge of the relevant conduct. (Dkt. No. 51-20, ¶ 37; Dkt. No. 58, ¶ 37).

Shortly thereafter, County Attorney Dorsey hired the law firm Bond, Schoeneck & King PLLC ("BSK") to conduct a confidential investigation into Plaintiff's complaint (the "BSK Investigation"). (Dkt. No. 51-20, ¶ 38; Dkt. No. 58, ¶ 38). On August 28, 2020, BSK issued a confidential report (the "BSK Report") documenting its findings. (Dkt. No. 51-20, ¶ 39; Dkt. No. 58, ¶ 39). The BSK Report includes accounts from interviews with eleven individuals. (Dkt. No. 58, ¶ 179; Dkt. No. 62-1, ¶ 179; Dkt. No. 63-1, ¶ 179; Dkt. No. 64-1, ¶ 179). It concludes:

> Overall, while some of [Kusnierz]'s conduct is direct, and even borderline unprofessional (e.g., asking for [Plaintiff]'s resignation), there is very little evidence to support that he engaged in this way because of [Plaintiff]'s sex. As a result, the Investigator concludes that [Kusnierz] did not violate the County's Harassment Policy by engaging in sexual harassment of [Plaintiff].

(Dkt. No. 52-2, at 30).

Also in April 2020, the County Board retained the law firm E. Stewart Jones Hacker Murphy LLP ("Jones Hacker") to investigate how and why the time-and-a-half plan came to be (the "Jones Hacker Investigation"). (Dkt. No. 51-20, ¶ 44; Dkt. No. 58, ¶ 44). Plaintiff was interviewed three times as part of the Jones Hacker Investigation, on April 30, June 24, and July 31, 2020. (Dkt. No. 51-20, ¶ 46; Dkt. No. 58, ¶ 46). On August 6, 2020, Jones Hacker issued a report (the "Jones Hacker Report"), (Dkt. No. 51-20, ¶ 45; Dkt. No. 58, ¶ 45), which appears to have been amended on October 1, 2020, to address the firm's "[mistaken] reliance on N.Y.

9

Labor Law § 193 and § 198 in certain portions of the Prior Report," (Dkt. No. 51-3, at 5). The

Jones Hacker Report lists five conclusions:

> The [County Board], as a body, is vested with authority to fix or modify the
> compensation of County employees (with few exceptions). Without [County
> Board] approval, on March 15, 2020 the County Administrator announced the time-
> and-a-half plan to department heads, and the [HR] Director reported it to
> representatives of the three unions. The County Administrator and the [HR]
> Director made these announcements on March 15 before the [County Board] had
> deliberated or authorized any such pay increases.

> The five-member Covid-19 oversight group created by [County Board] Resolution
> 84 of 2020 was a "public body" within the meaning of the New York Open
> Meetings Law. Accordingly, its meetings should have been open to the public, and
> the group was required to keep contemporaneous minutes of its meetings. In fact,
> the meetings were held in private, and there are no minutes, or any other record, of
> business conducted during the meetings. This has contributed to uncertainty and
> controversy about when and how the group decided to end the time-and-a-half pay
> for most physically-present workers for the March 20–April 2 pay period.

> There has been significant criticism of County Administrator Spencer Hellwig and
> HR Director [Plaintiff] for receiving time-and-a-half pay initially (for the week of
> March 16–19, which they reversed in subsequent payroll adjustments), while they
> were also members of the Covid oversight group responsible for deciding on
> compensation adjustments. Although it is not our province to tell the [County
> Board] whether that is a wise or unwise policy, we do not see illegality in what
> transpired in that regard. The record of the Law & Finance Committee and full
> Board meetings of March 17 indicate that Hellwig and [Plaintiff] broadly told those
> bodies that "everybody," "any County employee" reporting to work in person
> would receive the time-and-a-half pay for hours worked in person, under the plan
> that they proposed to have the Covid group to launch immediately. [Plaintiff] . . .
> would have qualified under the plan as described that night, except that she
> happened to be a County "officer" within the meaning of N.Y. County Law §201
> and, therefore, as a matter of state law, changes in her compensation require local
> law amendments subject to permissive referendum. However, the payroll
> supervisor has verified for us that [Plaintiff] returned the extra pay in a deduction
> from payroll on April 9, so the nonconformity with County Law §201 has been
> rectified.

> The Covid oversight group's decision to discontinue the time-and-a-half pay in the
> March 20–April 2 pay period for all employees except for 35 working in the Covid
> command center is very poorly documented. . . .

> The County also altered course on time-and-a-half pay for department heads and
> deputy department heads for the week of March 16–19. Nearly all department heads

and deputies received the extra pay for that week in their March 26 paychecks/deposits. Some members of the Covid oversight group subsequently reconsidered whether department heads and deputies should receive the extra pay, and decided to reverse it by making offsetting payroll deductions in the next paychecks of April 9. . . .

(*Id.* at 6–8). Plaintiff asserts that Defendant Kusnierz believed the Jones Hacker Report to be critical of her and that he urged the County Board to publicly release it. (Dkt. No. 58-2, ¶ 29).[2] Between August 6 and 13, 2020, the initial Jones Hacker Report was sent to local media outlets. (*Id.* ¶ 30).

Plaintiff states that in August 2020, she was informed by then-County Republican Committee Chairman Carl Zeilman that Defendant Kusnierz planned to call for her resignation at a County Board meeting on August 18, 2020. (Dkt. No. 58-2, ¶ 27). She asked Mr. Zeilman if her performance was an issue and he responded that it was not. (*Id.*). At the August 18, 2020 meeting, Defendant Kusnierz introduced a resolution to remove Mr. Hellwig from his position as County Administrator. (Dkt. No. 58-19, at 28–29). According to the minutes from this meeting, Multiple Supervisors voiced concerns with Defendant Kusnierz's resolution and Mr. Peck called the County Board's attention to a "bigger issue":

> [I]t has come to his attention that several months ago an unlawful workplace harassment case was filed by one of the members, against one of the members. An outside investigation [has] been going on for months. Cause [sic] now it looks more like after I've had these conversations they are going after [Hellwig], the Administrator, they want the [HR] Director who is on a term removed and now they are going after the County Attorney. Now it looks like the purpose is to squash or silence the pending report cause [sic] those are the people that know about it.

(*Id.* at 34).

---

[2] At a County Board meeting on August 12, 2020, Defendant Kusnierz stated that he had tried and failed to "garnish support from the Law and Finance Committee to make the" Jones Hacker Report available to the public and offered a motion to make the Report public. (Dkt. No. 58-19, at 2). After a discussion, during which each Supervisor present offered his or her opinion, a resolution was passed to release the report. (*Id.* at 8).

The resolution removing Mr. Hellwig was not voted on at the August 18, 2020 meeting, but the County Board did pass a resolution forming a committee of seven Supervisors (the "External Committee") to examine the findings laid out in the Jones Hacker Report. (Dkt. No. 51-20, ¶ 48; Dkt. No. 58, ¶ 48). Supervisor Jonathan Schopf recommended that Defendant Kusnierz serve on the External Committee despite knowing that Plaintiff had filed a complaint against him. (Dkt. No. 58, ¶ 213; Dkt. No. 62-1, ¶ 213; Dkt. No. 63-1, ¶ 213; Dkt. No. 64-1, ¶ 213). And Kusnierz attended four of the six External Committee meetings despite the apparent conflict. (Dkt. No. 58, ¶ 218; Dkt. No. 62-1, ¶ 218; Dkt. No. 63-1, ¶ 218; Dkt. No. 64-1, ¶ 218). Mr. Peck testified that at the August 18, 2020 meeting, Kusnierz, referring to Plaintiff and Mr. Hellwig, told him, "[t]hey are going after me, so I'm going after them," and then, "followed up with: You must know about the complaint." (Dkt. No. 58-9, at 108:22–23, 109:2–3).

On December 13, 2020, the External Committee submitted to the County Board a report (the "External Committee Report") summarizing several determinations made in the Jones Hacker Report:

> [Plaintiff] informed County staff that workers who showed up "in person" would be paid time and a half before the [County Board] discussed and voted to form the COVID-19 Oversight Group (Resolution 84-2020);
>
> [Plaintiff] presented incorrect information to the [County Board] regarding other local municipalities paying time and a half to "in person" essential workers; and
>
> [Plaintiff] failed to communicate effectively with the [County Board, labor unions and non-unionized employees] when the time and a half plan would end.

(Dkt. No. 51-6, 2–3). The External Committee Report recommends "action plans [] intended to hold County leaders accountable while also encouraging individual growth and the development of improved skills in leadership and management." (*Id.* at 4). Based on the External Committee Report, the County Board issued to Plaintiff a confidential counseling memorandum

recommending that she improve certain professional skills. (Dkt. No. 51-20, ¶¶ 51–52; Dkt. No. 58, ¶¶ 51–52).

On January 6, 2021, Defendant Kusnierz was elected Chairman of the County Board, after which, Plaintiff states:

> a. Even though I had been included in—and actively participated in— biweekly meetings with department head[s] throughout my tenure as HR Director[,] Defendant Kusnierz no longer included me in such meetings where important matters applicable to County and departmental employees were discussed, including meetings with labor unions.
> b. Defendant Kusnierz failed to reappoint me to important roles that I had consistently held, including the HIPAA Officer, the Affirmative Action Officer.
> c. Defendant Kusnierz undermined [m]y position by failing to keep me apprised of important human resources issues, such as union negotiations, which had historically been provided to me by the Chair.
> d. [Defendant] Kusnierz failed to include me in the labor management meetings with CSEA, PBA, and Corrections employees, which, as HR Director, I had always attended in the past.

(Dkt. No. 58-2, ¶ 36).

In a January 7, 2021 email, Mr. Peck writes, "Kusnierz wants [Plaintiff] punished for filing a harassment complaint against him. He did not heed the warning at filing from County Attorney Dorsey to not retaliate . . . . [Kusnierz] has removed Attorney Dorsey through forced resignation and yesterday [County Administrator] Hellwig. He only has [Plaintiff] left." (Dkt. No. 58-23, at 2–3).

### C.     The Search for an HR Director

Plaintiff's term as HR Director ended on May 22, 2021, and the County Board needed to reappoint Plaintiff for a second term or appoint someone new to the role. (Dkt. No. 51-20, ¶ 14; Dkt. No. 58, ¶ 14). The Human Resources and Insurance Committee discussed the issue on April 27, 2021, and the County Board formed a search committee, (Dkt. No. 51-20, ¶¶ 15–16; Dkt. No. 58, ¶¶ 15–16), though no such committee had been formed previously when there was an

incumbent in a director level position, (Dkt. No. 58, ¶¶ 60, 63; Dkt. No. 62-1, ¶¶ 60, 63; Dkt. No. 63-1, ¶¶ 60, 63; Dkt. No. 64-1, ¶¶ 60, 63). The search committee consisted of Supervisors Philip Barrett, Joseph Grasso, and Jonathan Schopf, along with Defendant Bulger and the County's Commissioner of Social Services, Tina Potter. (Dkt. No. 53-1, ¶ 31; Dkt. No. 58-2, ¶ 43). Defendant Bulger states in his February 23, 2024 affidavit that while the HR Department is typically involved in the selection of candidates, since the committee was formed to identify an HR Director, his office took the lead. (Dkt. No. 53-1, ¶ 35). Plaintiff states in her affidavit, however, that "it [was] unusual and inappropriate for someone in Commissioner Potter's role to be part of the search committee" because "[she] reported to me for guidance on personal matters. Typically, the search committee of this nature would be made up of Supervisors, the County Administrator, and other appointed, upper level County officials." (Dkt. No. 58-2, ¶ 46).

Plaintiff continued as HR Director while the search committee conducted its search, even after her term had expired. (Dkt. No. 51-20, ¶ 21; Dkt. No. 58, ¶ 21). According to Plaintiff, she told Defendant Bulger prior to the April 27, 2021 meeting that she did not want to be considered for another term if it would result in "additional negative publicity, humiliation, and reputational damage." (Dkt. No. 58-2, ¶ 38). She states that he encouraged her to submit her reappointment paperwork and said that he would "ask the question." (*Id.*).

The search committee received thirty applications for the HR Director position, (Dkt. No. 51-20, ¶ 22; Dkt. No. 58, ¶ 22), and focused its search on six candidates, including Plaintiff, (Dkt. No. 51-20, ¶ 22; Dkt. No. 58, ¶ 22). In May and early June 2021, the committee vetted, interviewed, and considered these candidates, (Dkt. No. 51-20, ¶ 23; Dkt. No. 58, ¶ 23), before unanimously recommending Scot Chamberlain for the position, (Dkt. No. 51-20, ¶ 23; Dkt. No.

58, ¶ 23). On June 11, 2023, Defendant Bulger emailed[3] the Law and Finance Committee members to notify them of the search committee's selection. (Dkt. No. 51-11, at 2–3). That same day, Plaintiff emailed the County Board, stating that "[i]t is Supervisor Kusnierz's intention, with the support of a few others, to terminate my employment with the County in retaliation for a harassment complaint I filed against him in April of 2020," and noting her "plan to file a complaint with the Equal Employment Opportunity Commission ('EEOC') as well as an internal complaint with the County Attorney." (Dkt. No. 58-28, at 3).

### D.     The June 15, 2021 County Board Meeting

The next County Board meeting was scheduled for June 15, 2021, (Dkt. No. 51-20, ¶ 26; Dkt. No. 58, ¶ 26), and the search committee's recommendation to appoint Mr. Chamberlain was added to the meeting agenda as "other business," (Dkt. No. 51-20, ¶ 27; Dkt. No. 58, ¶ 27). At the meeting, Mr. Barrett and Mr. Lant motioned to add Resolution 2021-190, appointing Mr. Chamberlain as HR Director, to the meeting agenda, which passed. (Dkt. No. 51-20, ¶ 28; Dkt. No. 58, ¶ 28).

According to Plaintiff, "Mr. Chamberlain's appointment was handled outside the scope of ordinary procedures and process utilized by the [County Board]. Specifically, the resolution to appoint Mr. Chamberlain was not disclosed until the meeting has already begun." (Dkt. No. 58-2, ¶ 55). She states, "no Supervisors outside of Defendant Kusnierz's allies . . . were aware that there would be a resolution put forth to replace me at the Board meeting." (*Id.* ¶ 56). Mr. Peck testified similarly that when the County Board voted on Resolution 2021-190, he knew

---

[3] Supervisor Sandra Winney, who was a member of the Law and Finance Committee, stated at a June 15, 2021 County Board meeting that she never received notice of Mr. Chamberlain's candidacy. (Dkt. No. 58-17, at 32). But Defendant Bulger's email does appear to have been sent to a contact saved as "Sandra Winney." (Dkt. No. 51-11, at 2).

"[n]othing or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," and that "[n]othing was being done the way we used to." (Dkt. No. 58-9, at 120:23–121:10).

Supervisors Benny Zlotnick and John Lawler introduced successive motions to amend Resolution 2021-190 to replace Mr. Chamberlain's name with Plaintiff's. (Dkt. No. 51-20, ¶ 29; Dkt. No. 58, ¶ 29). After some discussion, during which Lawler emphasized his "serious concerns about the process," (Dkt. No. 58-17, at 35), both motions to amend failed, (Dkt. No. 51-20, ¶ 30; Dkt. No. 58, ¶ 30), and the original resolution appointing Mr. Chamberlain as HR Director proceeded to a vote, (Dkt. No. 51-20, ¶ 31; Dkt. No. 58, ¶ 31). Ten Supervisors, including Defendant Kusnierz, voted in favor of the resolution, while twelve Supervisors voted against it. (Dkt. No. 58-17, at 49–52). However, the ten Supervisors who voted in favor of the resolution controlled 122,546 weighted votes, compared to the 91,468 weighted votes controlled by the twelve Supervisors who voted against it. (Dkt. No. 51-20, ¶ 31; Dkt. No. 58, ¶ 31). Thus, Resolution 2021-190 passed. (Dkt. No. 58-17, at 52).

Defendant Bulger attended but did not speak at the meeting. (Dkt. No. 51-20, ¶ 33; Dkt. No. 58, ¶ 33). Plaintiff states that after the meeting Supervisor Jean Raymond, who voted in favor of the resolution, told Plaintiff that she was "afraid to vote against Defendant [Kusnierz], and that she would not get any monies for her town if she did not vote with [him]." (Dkt. No. 58-2, ¶ 60).

### E.   Plaintiff's Separation

As Mr. Chamberlain could not begin work as HR Director until early August 2021, Plaintiff remained in the position until July 23, 2021. (Dkt. No. 51-20, ¶ 34; Dkt. No. 58, ¶ 34).

Under the County's Administrative Benefits Policy, accrued sick pay is only paid out when an employee retires. (Dkt. No. 51-20, ¶ 53; Dkt. No. 58, ¶ 53). In July 2021, Plaintiff indicated to Defendant Bulger that prior to his tenure as County Administrator other employees

who were not retiring but were leaving employment with the County for various reasons had been paid their accrued sick pay by agreement. (Dkt. No. 51-20, ¶ 54; Dkt. No. 58, ¶ 54; Dkt. No. 53-1, ¶ 60). Defendant Bulger asked Plaintiff to send him a template or prior example of such an agreement, which she did. (Dkt. No. 51-20, ¶¶ 55–56; Dkt. No. 58, ¶¶ 55–56; Dkt. No. 53-3). Based on that template, the County Attorney drafted a separation agreement for Plaintiff that provided payment for accrued sick time. (Dkt. No. 51-20, ¶ 57; Dkt. No. 58, ¶ 57; Dkt. No. 53-4). Plaintiff objected to the proposed agreement because it contained a waiver of claims clause and a clause stating that the agreement was subject to County Board approval. (Dkt. No. 51-20, ¶ 58; Dkt. No. 58, ¶ 58). Both clauses appear in the agreement Plaintiff had sent Defendant Bulger. (Dkt. No. 51-20, ¶ 59; Dkt. No. 58, ¶ 59). Plaintiff states, "I did not sign the [agreement], and the County never paid me for my accrued sick leave." (Dkt. No. 58-2, ¶ 71).

Supervisor Darren O'Connor made some attempt to find Plaintiff another position within the County, (Dkt. No. 51-20, ¶ 60; Dkt. No. 58, ¶ 60), and Defendant Bulger had discussions with Mr. O'Connor and Deputy HR Director Adam Kinowski about creating a new management position in the HR Department, (Dkt. No. 51-20, ¶ 61; Dkt. No. 58, ¶ 61). Plaintiff states that she discussed a potential position with the Director of the County's Mental Health Center, but "although he wanted to offer me the position, he was told by Defendant Bulger that 'there was too much controversy' surrounding me and that the Board would not support my appointment." (Dkt. No. 58-2, ¶¶ 64–65).

## III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears

the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.   DISCUSSION

Plaintiff brings the following claims: (1) Title VII claims against the County Defendants[4] for hostile work environment (motivated by gender bias and retaliation) and retaliation (First, Second, and Third Causes of Action); (2) NYSHRL claims against all Defendants for gender discrimination, harassment, and retaliation and against Defendants Kusnierz and Bulger for aiding and abetting gender discrimination, harassment, and retaliation (Fourth Cause of Action); and (3) a § 1983 claim against Defendant Kusnierz for violating Plaintiff's right to equal protection under the Fourteenth Amendment (Fifth Cause of Action). (Dkt. No. 4). Defendants move for summary judgment and seek dismissal of Plaintiff's claims in their entirety. (Dkt. Nos. 51–53). Plaintiff opposes Defendants' motions. (Dkt. No. 58).

### A.      Title VII – Hostile Work Environment and Retaliation

#### 1.      Hostile Work Environment

Defendants argue that Plaintiff's hostile work environment claims must be dismissed because she cannot show severe or pervasive conduct sufficient to create a hostile work environment or that the conduct at issue was motivated by Plaintiff's gender. (Dkt. No. 51-19, at 15–16). Plaintiff disagrees. (Dkt. No. 58-3, at 31–36).

---

[4] It appears that Defendants interpret the amended complaint to include Title VII claims against the individual Defendants as well, (*see, e.g.*, Dkt. No. 52-4, at 9 (stating that Plaintiff has asserted Title VII claims against all Defendants)), and on this the amended complaint is indeed ambiguous, (*see* Dkt. No. 4, ¶¶ 89–105). Thus, for the sake of clarity, the Court notes that "individuals are not subject to liability under Title VII," *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023) (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)), and, consequently, any Title VII claims against the individual Defendants are dismissed.

### a.     Relevant Law

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate harassment on the basis of his or her sex, 42 U.S.C. § 2000e-2(a), and "that his or her workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Courts may also consider "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile work environment claim, "[t]he incidents typically 'must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."'" *Agosto*, 982 F.3d at 102 (quoting *Alfano*, 294 F.3d at 374).

Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks omitted); *accord Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to establish a hostile work environment" (internal quotation marks omitted)). Further, "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks omitted).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). But if no reasonable jury could conclude, considering all the circumstances, that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*," *Schiano*, 445 F.3d at 600 (quoting *Whidbee*, 223 F.3d at 70 (2d Cir. 2000)), a court may conclude as a matter of law that the work environment is not sufficiently hostile to violate Title VII.

### b.    Analysis

The evidence supporting Plaintiff's hostile work environment claims suggests that for months she experienced obnoxious, repeated harassment by Defendant Kusnierz. The record includes evidence that in 2020 Kusnierz blamed Plaintiff for issues beyond her control, (Dkt. No.

58-2, ¶ 7 (Plaintiff asserting that Kusnierz blamed Plaintiff "for issues with his enrollment" in

the state retirement system even though neither she nor her department "had any control of his

registration submissions")); that beginning in January 2020 he became aggressive toward

Plaintiff "at every [weekly] meeting," (Dkt. No. 58-9, at 46); that on March 25, 2020, he publicly

identified her to a local newspaper, singling her out by name and stating that it was "absolutely

outrageous" to be paying her time-and-a-half, but not naming any of the male supervisors also

being paid time-and-a-half, (Dkt. No. 52-2, at 95); that he "went from calling her Director

McNamara to calling her madame" when he questioned her at public meetings, (Dkt. No. 58-9,

at 75:12–76:14); that at a March 27, 2020 meeting with Supervisors and staff, he turned on his

microphone and "screamed" at her, becoming red in the face, referred to her as "madame," and

demanded she resign, (*id.* at 72:1–4); and that after that meeting, he demanded that she apologize

to him, (Dkt. No. 58, ¶ 156; Dkt. No. 62-1, ¶ 156; Dkt. No. 63-1, ¶ 156; Dkt. No. 64-1, ¶ 156).

There is evidence that this harassment was at times physically threatening, (*see* Dkt.

No. 58-2, ¶ 24 (Plaintiff stating that "[the] County Sheriff noticed . . . and physically stood in

[Plaintiff's] office with [Plaintiff] to ensure [she] felt protected")), and that it interfered with

Plaintiff's ability to perform her job, (*see id.* ¶ 25 (Plaintiff stating that she began sending her

deputy to meetings in her place "to avoid [Defendant Kusnierz's] public abuse, despite

[attending meetings] being a crucial part of [her] job")). And there is also evidence that after

Defendant Kusnierz became Chairman of the County Board on January 6, 2021, he reduced the

scope of Plaintiff's responsibilities by excluding her from "biweekly meetings with department

heads" that she had "attended throughout her tenure," withholding information regarding "human

resources issues," including union negotiations, and not reappointing her to her roles as the

HIPAA and Affirmative Action Officer, which she had "consistent held." (*Id.* ¶ 36)

The County Defendants argue that many of the acts Plaintiff complains of are "not tethered to her gender," (Dkt. No. 51-19, at 15), but "so long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was 'because of' the plaintiff's gender, 42 U.S.C. § 2000e–2(a)(1), is a question of fact for the factfinder," *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010); *see also Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001) (observing that the Second Circuit "has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex."). Several of the incidents noted above were gendered. (*See, e.g.*, Dkt. No. 58-2, ¶¶ 16–17 (Plaintiff stating that Defendant Kusnierz criticized her but not her similarly situated male counterparts to the press); Dkt. No. 58-9, at 75:12–76:14 (Mr. Peck testifying that Defendant Kusnierz "went from calling her Director McNamara to calling her madame" when he questioned her at public meetings")). And Plaintiff has introduced testimony from individuals who worked with Defendant Kusnierz that his conduct toward Plaintiff was part of a broader pattern of hostile behavior toward women. (*See, e.g.*, Dkt. No. 58-9, at 85:3–6 (Mr. Peck testifying that Defendant Kusnierz "was more aggressive with accomplished women than accomplished men."); Dkt. No. 58-10, at 44:5–6 (Mr. Hellwig testifying that "[t]here just seemed to be a trend with [Defendant Kusnierz] that related to females")).

"While the standard for establishing a hostile work environment [claim] is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). Therefore, even though most of the incidents identified by Plaintiff are gender neutral on their face and none of them, considered in isolation, possess characteristics

that would allow a factfinder to conclude the harassment was so "severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment,'" *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 21), viewed cumulatively and in the light most favorable to Plaintiff, the allegations of months of continuous harassment, together with the evidence of Defendant Kusnierz's bias against women, are sufficient to survive summary judgment. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020) (courts assess objective hostility under the "totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance").

However, to succeed on a Title VII hostile work environment claim, a plaintiff must also show "a specific basis for imputing the hostile work environment to the employer," and this Plaintiff is unable to do. *Fitzgerald*, 251 F.3d at 357. The standard for imposing liability on an employer for workplace harassment by employees depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Vance v. Ball St. Univ.*, 570 U.S. 421, 424 (2013) (citations omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher*, 524 U.S. at 807). In *Vance*, the Supreme Court further held that "an employee is a 'supervisor' for purposes of vicarious liability under

Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

To establish an employer's negligence in controlling workplace conditions, a plaintiff must demonstrate that his employer: (i) "failed to provide a reasonable avenue for complaint"; or (ii) "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)); *accord Vance*, 570 U.S. at 449 (noting that a plaintiff could show that his "employer was negligent in failing to prevent harassment from taking place" with, inter alia, "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed"). The second avenue of vicarious liability (knowledge and failure to act) "requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763.

As a member of the County Board, Defendant Kusnierz participated in personnel decisions, including by voting on resolutions bearing on Plaintiff's employment as HR Director. (Dkt. No. 51-20, ¶ 11; Dkt. No. 58, ¶ 11). However, even as Chairman, Defendant Kusnierz was one of twenty-three Supervisors on the County Board, and his vote, which was accorded a weight in proportion to the population of the Town of Moreau, was neither sufficient nor necessary for a resolution to pass. *See Blair v. Frenchko*, No. 23-3609, 2024 WL 400227, at *2,

2024 U.S. App. LEXIS 2426, *3–4 (6th Cir. Feb. 2, 2024) ("A board is directly liable for an individual member's discriminatory intent only when that member is the deciding cause of board action.") (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 262–63 (6th Cir. 2006)). Indeed, Defendant Kusnierz controlled 14,728 weighted votes, (Dkt. No. 51-20, ¶ 32; Dkt. No. 58, ¶ 32), and the resolution appointing Mr. Chamberlain as HR Director passed with 122,546 weighted votes in favor and 91,468 weighted votes in opposition, (Dkt. No. 51-20, ¶ 31; Dkt. No. 58, ¶ 31), meaning that even if Defendant Kusnierz had abstained from this particular vote, the weighted votes in favor of the resolution would have exceeded those in opposition. Thus, Defendant Kusnierz did not have the power to hire or fire Plaintiff. Accordingly, he is best characterized as a co-worker and a negligence standard applies.

Shortly after Plaintiff's complaint was filed with the County Attorney's Office on April 28, 2020, the County hired BSK to conduct a confidential investigation. (Dkt. No. 51-20, ¶ 38; Dkt. No. 58, ¶ 38). The BSK Report, issued on August 28, 2020, acknowledges that Defendant Kusnierz's conduct was "borderline unprofessional," but states that there was very little evidence that his conduct was related to Plaintiff's gender and concludes that he had not violated the County's Harassment Policy. (Dkt. No. 52-2, at 30). Evidently, the County had in place a system for registering complaints and responded promptly to Plaintiff's. Hiring a law firm to investigate the allegations was reasonable under the circumstances and the County was entitled to rely on its findings. Therefore, even though Plaintiff has introduced evidence from which a factfinder could reasonably find that the harassment Plaintiff endured was motivated by her gender and sufficiently severe or pervasive to alter the conditions of her employment, Plaintiff has failed to raise a material issue of fact as to the County Defendants' liability. Accordingly, summary judgment is granted as to Plaintiff's hostile work environment claims under Title VII.

Plaintiff also appears to bring hostile work environment claims based on retaliatory acts. (*See* Dkt. No. 4, ¶¶ 93–98). And, in fact, Plaintiff has adduced evidence, discussed below, that she experienced potentially retaliatory incidents after filing her April 28, 2020 complaint of sexual harassment that may have been severe or pervasive enough for a reasonable person in her position to find the environment to be hostile or abusive and the conditions of her employment altered. However, there is no evidence that Plaintiff complained of this retaliation prior to her June 11, 2021 email to the County Board.[5] As a result, liability for hostile work environment cannot be imputed to the County Defendants under Plaintiff's retaliatory acts theory, either, and summary judgment must be granted as to these claims as well. *See Murphy v. Wappingers Cent. Sch. Dist.*, No. 15-cv-7460, 2018 WL 1831847, at *7, 2018 U.S. Dist. LEXIS 63761, at *17 (S.D.N.Y. Apr. 16, 2018) (granting summary judgment where "there [wa]s no evidence to suggest the District failed to respond to complaints of harassment" and observing that the "plaintiff did not complain about DeFazio's abusive conduct for more than a year and a half after the conduct began"); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (stating that "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *accord Duch*, 588 F.3d at 762.

---

[5] Plaintiff sent an email to the County Board on March 26, 2020, stating that Defendant Kusnierz "has been extremely offensive and retaliatory during our recent conversations." (Dkt. No. 52-2, at 38–39). However, Plaintiff's email did not explain what retaliation she was referring to, nor was it followed by a formal complaint of retaliation. Aside from that, Plaintiff's March 26, 2020 email precedes the date on which she filed her complaint of sexual harassment, April 28, 2020, which is the action she was allegedly retaliated against for taking. (*See infra* § IV.A.2).

### 2.      Retaliation

Defendants argue that Plaintiff's retaliation claims are subject to summary judgment as well because she cannot show a causal connection between a protected activity and a materially adverse action. (Dkt. No. 51-19, at 18–19). Plaintiff responds that she has raised triable issues of material fact. (Dkt. No. 58-3, at 39–47).

### a.      Relevant Law

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–74 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)) . Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by showing evidence that: (1) he engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action. *Id.* at 129. If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

       **b.**      **Prima Facie Case**

       **i.**      **Protected Activity**

Plaintiff argues that she engaged in protected activity on three occasions: on March 26, 2020, when she emailed the County Board requesting that Defendant Kusnierz direct all HR requests through an intermediary; on April 28, 2020, when she filed a formal complaint with the County Attorney's Office alleging sexual harassment by Defendant Kusnierz; and on June 11, 2021, when she emailed the County Board stating that Defendant Kusnierz intended to terminate her in retaliation for her complaint and that she planned to file a complaint with the EEOC. (Dkt. No. 58-3, at 41).

The Court agrees that Plaintiff's April 28, 2020 complaint and June 11, 2021 email constitute protected activity. *See Hubbard v. Total Communs. Inc.*, 347 F. App'x 679, 680–81 (2d. Cir. 2009) (summary order) ("'Protected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or hearing under Title VII" and "a plaintiff . . . need not prove that the conditions she protested amounted to an actual Title VII violation; she need only establish that she had a good faith, reasonable belief that a violation occurred." (first citing 42 U.S.C. § 2000e-3(a), and then citing *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999))). However, Plaintiff's March 26, 2020 email, which contains no reference to gender-based conduct prohibited by Title VII, does not. *See Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity.").

#### ii.     Awareness of Protected Activity

There is no dispute that Defendants were aware of Plaintiff's April 28, 2020 complaint, (Dkt. No. 51-20, ¶ 36; Dkt. No. 58, ¶ 36), and June 11, 2021 email, (Dkt. No. 58, ¶ 269; Dkt. No. 62-1, ¶ 269; Dkt. No. 63-1, ¶ 269; Dkt. No. 64-1, ¶ 269). Thus, the second element is satisfied.

#### iii.     Adverse Action

Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *White*, 548 U.S. at 64) (alterations in original). The Supreme Court has explained that it has:

> phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*White*, 548 U.S. at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Baines*, 593 F.3d at 165 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

In this case, Plaintiff alleges that she suffered an adverse action when she was not reappointed as HR Director. (Dkt. No. 58-3, at 40 (Plaintiff referring to losing her job and

asserting that Defendants only challenge the fourth element of her retaliation claims—causal connection)). "It is clear that an employer's failure to rehire an employee qualifies as an adverse employment action under Title VII." *Khan v. Hilton Worldwide, Inc.*, No. 14-cv-1011, 2015 WL 738108, at *4, 2015 U.S. Dist. LEXIS 20638, at *11 (S.D.N.Y. Feb. 20, 2015). Accordingly, the Court turns to the fourth element.

### iv.    Causal Connection

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted); *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of retaliation 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)); *see El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (recognizing that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII").

Defendants assert that there "is a timing issue" because more than a year passed between Plaintiff's April 28, 2020 complaint and the County Board's June 15, 2021 vote to appoint Mr. Chamberlain as HR Director. (Dkt. No. 51-19, at 19). But Plaintiff engaged in protected activity not just on April 28, 2020, when she filed her complaint, but also on June 11, 2021, when she

emailed the County Board. And Plaintiff's June 11, 2021 email preceded the vote to appoint Mr.

Chamberlain as HR Director by just four days. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d

93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes

of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to

establish causation, we have previously held that five months is not too long to find the causal

relationship."); *Summa*, 708 F.3d at 125 (finding causation where there was a seven-month gap

between protected activity and adverse action); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–

46 (2d Cir. 1980) (finding causation where there was an eight month gap between protected

activity and adverse action).

Moreover, the context in which the June 15, 2021 vote took place is important, and

Plaintiff has presented strong evidence of retaliatory animus closer in time to Plaintiff's April 28,

2020 complaint. On August 18, 2020, Defendant Kusnierz told Mr. Peck that he was "going after

[Plaintiff and Hellwig]." (Dkt. No. 58-9, at 108:22–23; *see also* Dkt. No. 58-19, at 34 (meeting

minutes reflecting that Mr. Peck said that Defendant Kusnierz and others "are going after

[Hellwig], the County Administrator, they want the [HR] Director . . . removed and now they are

going after the County Attorney" and that "it looks like the purpose is to squash or silence the

pending report"); Dkt. No. 58-23, at 2–3 (Mr. Peck stating in a January 7, 2021 email that

"Kusnierz wants [Plaintiff] punished for filing a harassment complaint against him.")).

Defendant Kusnierz's persistent harassment escalated after he became Chairman on January 6,

2021, and was, likely for the first time, able to reduce the scope of her role as HR Director. *See*

*Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding a causal connection between the

dismissal of the plaintiff's lawsuit and an allegedly retaliatory beating by officers six months

later and observing that "[i]t is plausible that the officers waited to exact their retaliation at an

opportune time—as when [the plaintiff] was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by [the plaintiff]"); *Summa*, 708 F.3d at 128 ("The start of the spring season was the first moment in time when the football coaching staff could have retaliated against [the plaintiff] as she was not directly working for them over the intervening months."). And there appear to have been irregularities in the search and hiring process for an HR Director, which commenced on April 27, 2021, approximately one month before the end of Plaintiff's term. (*See, e.g.*, Dkt. No. 58-2, ¶ 56 (Plaintiff stating that "no Supervisors outside of Defendant Kusnierz's allies . . . were aware that there would be a resolution put forth to replace me at the Board meeting."); Dkt. No. 58-9, at 120:23–121:10 (Mr. Peck testifying that when the County Board voted on Resolution 2021-190, he knew "[n]othing or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," and that "[n]othing was being done the way we used to.")).

The Court thus finds that the timing of the potentially retaliatory incidents, including Defendant Kusnierz's actions after becoming Chairman of the County Board, together with the context in which these incidents took place and the strong evidence of retaliatory animus, is sufficient to establish a causal nexus between Plaintiff's complaint and email, on the one hand, and the decision not to reappoint her as HR Director, on the other. *See Summa*, 708 F.3d at 128 ("the combination of reasonably close temporal proximity and the particular context in this case is sufficient to infer causation in establishing a prima facie case of retaliation regarding the termination of [the plaintiff's] employment privileges at Hofstra."). As a result, the Court finds that Plaintiff has established a prima facie case of retaliation, and a presumption of retaliation arises.

### c.   Legitimate Nondiscriminatory Reasons

The burden now shifts to the County Defendants to show a "legitimate, nondiscriminatory reason" for the adverse actions. *McDonnell Douglas*, 411 U.S. at 802. The County Defendants' burden "is not a particularly steep hurdle." *Hyeck v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The County Defendants have satisfied their burden here with evidence—including affidavits from six Supervisors who voted to appoint Mr. Chamberlain as HR Director—that the decision not to reappoint her as HR Director was based on her job performance and a belief that Mr. Chamberlain was well-suited for the role. (*See* Dkt. No. 51-1, ¶ 59; Dkt. No. 51-14, ¶ 16; Dkt. No. 51-15, ¶¶ 8–9; Dkt. No. 51-16, ¶¶ 12–13; Dkt. No. 51-17, ¶¶ 7, 10; Dkt. No. 51-18, ¶¶ 11–14). As a result, the Court finds that Defendants have offered a legitimate, nondiscriminatory reason for replacing Plaintiff as County Administrator and the "presumption of retaliation dissipates." *Ya-Chen Chen*, 805 F.3d at 70. The burden shifts back to Plaintiff to establish "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

### d.   Pretext for Retaliation

At the third stage of the *McDonnell Douglas* burden-shifting analysis, "a plaintiff alleging retaliation must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846–847 (2d Cir. 2013) (quoting *Nassar*, 570 U.S. at 348, 360). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."

*Id.* at 846. "[A] plaintiff may rely on evidence comprising [her] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847. Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id*. at 846.

Here, the Court concludes that Plaintiff has adduced sufficient evidence that the reason proffered by the County Defendants for replacing Plaintiff as HR Director is false or pretextual. In explaining their purported dissatisfaction with Plaintiff's job performance, the County Defendants rely to a significant extent on her role in the time-and-a-half plan. But the resolution approving the plan was passed unanimously by the County Board. (Dkt. No. 58-18, at 19). And as a County employee Plaintiff did not vote on it. (Dkt. No. 58, ¶ 122; Dkt. No. 62-1, ¶ 122; Dkt. No. 63-1, ¶ 122; Dkt. No. 64-1, ¶ 122). Moreover, Defendant Mr. Kusnierz testified at his deposition that his concerns regarding the plan were addressed before he voted to authorize it in March 2020. (Dkt. No. 58-5, at 207:14–16).

The Jones Hacker Report does not propose any disciplinary action against Plaintiff. (Dkt. No. 58, ¶ 201; Dkt. No. 62-1, ¶ 201; Dkt. No. 63-1, ¶ 201; Dkt. No. 64-1, ¶ 201). And while the County Board created an External Committee to examine the findings laid out in the Jones Hacker Report and recommend appropriate disciplinary action against any employee named within it, (Dkt. No. 51-20, ¶ 48; Dkt. No. 58, ¶ 48), Defendant Kusnierz attended four of the six External Committee meetings despite the apparent conflict, (Dkt. No. 58, ¶ 218; Dkt. No. 62-1, ¶ 218; Dkt. No. 63-1, ¶ 218; Dkt. No. 64-1, ¶ 218). Finally, to the extent the County Defendants argue that the decision to replace Plaintiff reflects Mr. Chamberlain's abilities, apparent irregularities in the HR Director search and hiring process are sufficient to raise a factual

question as to this claim. (*See e.g.*, Dkt. No. 58-9, at 120:23–121:10 (Mr. Peck testifying that

when the County Board voted on the resolution appointing Mr. Chamberlain, he knew "[n]othing

or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," and that "[n]othing

was being done the way we used to.")).

Taking into account the indicia of retaliatory animus discussed above, the Court

concludes that Plaintiff has introduced sufficient evidence that, if credited, would allow a

reasonable factfinder to conclude that the legitimate, non-discriminatory reason proffered by the

County Defendants is pretextual and that retaliation was a but-for cause of the decision to replace

Plaintiff as HR Director. Accordingly, summary judgment is denied as to Plaintiff's Title VII

claims against the County Defendants for retaliation.

### B.    NYSHRL – Discrimination, Harassment, Retaliation, and Aiding & Abetting

### 1.    Discrimination

Plaintiff brings NYSHRL claims for gender discrimination against all Defendants based

on the adverse employment action she suffered "when she was not reappointed to her position."

(Dkt. No. 58-3, at 39). Defendants move for summary judgment. (Dkt. No. 51-19, at 22).

#### a.    Relevant Law

In general, claims of employment discrimination via NYSHRL are analyzed under the

*McDonnell Douglas* framework that governs such claims under Title VII.[6] *See Hill v. City of*

*New York*, 136 F. Supp. 3d 304, 331 (E.D.N.Y. 2015). Using this framework, the plaintiff must

first establish a prima facie case of employment discrimination. *Hicks*, 509 U.S. at 506. To

establish a prima facie case, a plaintiff must show that: "(1) [s]he is a member of a protected

---

[6] Unlike Title VII, a plaintiff may bring a discrimination claim against an individual under NYSHRL and § 1983. *See Naumovski v. Norris*, 934 F.3d 200, 212–13 (2d Cir. 2019). The Court notes that there are several other distinctions not relevant here.

class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse

employment action; and (4) the adverse action took place under circumstances giving rise to an

inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant, who must

articulate a legitimate, non-discriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07. If

the defendant carries that burden, the burden shifts back to the plaintiff, who must "come

forward with evidence that the defendant's proffered, non-discriminatory reason is a mere

pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

### b.    Analysis

It is undisputed that, as a woman, Plaintiff is a member of a protected class, and that she

meets the minimum qualifications to be HR Director. She also was not reappointed to a second

term as HR Director, which is an adverse action. As to the fourth element, the Court finds that

Plaintiff has introduced evidence from which an inference of gender bias can be drawn. As the

Court has explained, Defendant Kusnierz made negative comments about Plaintiff to the press,

without mentioning her similarly situated male counterparts, (Dkt. No. 58-2, ¶¶ 16–17), and

"went from calling her Director McNamara to calling her madame" when he questioned her at

public meetings, (Dkt. No. 58-9, at 75:12–76:14). These incidents occurred in the context of

months of repeated harassment by Defendant Kusnierz, who was hostile and aggressive toward

Plaintiff at weekly meetings. (*Id.* ¶¶ 9, 19, 23; Dkt. No. 52-2, at 24–25). And several individuals

who worked with Defendant Kusnierz have testified that his conduct toward Plaintiff was

consistent with a pattern of hostile behavior toward other women. (*See, e.g.*, Dkt. No. 58-9, at

85:3–6 (Mr. Peck testifying that Defendant Kusnierz "was more aggressive with accomplished

women than accomplished men."); Dkt. No. 58-10, at 44:5–6 (Mr. Hellwig testifying that

"[t]here just seemed to be a trend with [Defendant Kusnierz] that related to females")). Thus, Plaintiff has established a prima facie case of gender discrimination under the NYSHRL.

While Defendants have articulated a legitimate, non-discriminatory reason for not reappointing Plaintiff as HR Director—that the decision was based on her job performance and a belief that her replacement was well-suited for the role—Plaintiff has also introduced evidence that this proffered, non-discriminatory reason is a mere pretext for discrimination, including that Plaintiff was ultimately replaced as HR Director by Mr. Chamberlain, a man, at the end of a search and hiring process that appears to have been irregular. (*See* Dkt. No. 58-9, at 120:23–121:10 (Mr. Peck testifying that when the County Board voted on Resolution 2021-190, he knew "[n]othing or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," and that "[n]othing was being done the way we used to.")).

As a result, summary judgment is denied as to Plaintiff's NYSHRL claims for gender discrimination.

### 2.   Harassment

Plaintiff brings NYSHRL claims for harassment against all Defendants based on a theory of hostile work environment. (*See* Dkt. No. 58-3, at 31). "Hostile workplace claims brought under Title VII . . . and the NYSHRL are assessed using the same standard," *Banks v. General Motors, LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (collecting cases), and, as discussed above, a plaintiff must show "both (1) a hostile work environment and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer," *Swiderski v. Urb. Outfitters, Inc.*, No. 14-cv-6307, 2015 WL 3513088, at *3, 2015 U.S. Dist. LEXIS 72291, at *8 (S.D.N.Y. June 4, 2015) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998)).

Although Plaintiff has introduced evidence from which a factfinder could reasonably find that the harassment Plaintiff endured was motivated by her gender and sufficiently severe or pervasive to alter the conditions of her employment, Plaintiff has failed to establish a sufficient basis to impute Defendant Kusnierz's conduct to the County Defendants. Accordingly, summary judgment is granted as to Plaintiff's NYSHRL claims for harassment.

### 3.      Retaliation

"Generally, the same analysis applies to retaliation claims made under the NYSHRL and Title VII." *Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 295 (W.D.N.Y. 2014). In other words, under the *McDonnell Douglas* burden-shifting framework, the plaintiff must establish a prima facie case of retaliation by showing evidence that: (1) she engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against her; and (4) there is a causal connection between the protected activity and the adverse action. *Summa*, 708 F.3d at 125. If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action. *Id.* at 129. If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show "that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 U.S. at 352.

As the Court has explained, Plaintiff has introduced sufficient evidence that, if credited, would allow a reasonable factfinder to conclude that the legitimate, non-discriminatory reason proffered by the County Defendants for the decision to replace Plaintiff as HR Director is pretextual. Therefore, summary judgment is denied as to Plaintiff's NYSHRL claims for retaliation.

### 4.      Aiding & Abetting

Plaintiff brings NYSHRL claims against Defendants Kusnierz and Bulger for aiding and abetting gender discrimination, harassment, and retaliation. (Dkt. No. 4, ¶¶ 106–17). Defendants Kusnierz and Bulger move for summary judgment dismissing these claims. (Dkt. No. 52-4, at 9; Dkt. No. 53-7, at 17).

"By its terms, § 296(6) of the Human Rights Law creates a 'broad[ ] source of personal liability' that is not limited to employers or employees." *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011); *see also Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). In the Second Circuit, individuals can be held liable as aiders and abettors when they "actually participate[d] in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Ellerth*, 524 U.S. at 118; *see also Oliver v. N.Y. State Police*, No. 15-cv-444, 2020 WL 1989180, at *51, 2020 U.S. Dist. LEXIS 73284, at *163–64 (N.D.N.Y. Apr. 27, 2020) ("A plaintiff seeking to bring an aiding and abetting claim for retaliation must demonstrate that individual defendants were involved, or participated in, retaliation following a plaintiff's complaint of discrimination." (citing *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 662 (E.D.N.Y. 2015)), *aff'd sub nom. Oliver v. D'Amico*, No. 22-cv-979, 2024 WL 2013670, 2024 U.S. App. LEXIS 11099 (2d Cir. May 7, 2024) (summary order).

Because summary judgment is granted as to Plaintiff's NYSHRL harassment claims, summary judgment is also granted as to Plaintiff's NYSHRL claims against Defendants Kusnierz and Bulger for aiding and abetting harassment. *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 122 (S.D.N.Y. 2022) ("In order for a defendant to be liable as an aider and abettor under . . . the NYSHRL, a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal.").

As to the claims for aiding and abetting discrimination and retaliation, Plaintiff has adduced evidence, discussed throughout this opinion, that Defendant Kusnierz "actually participate[d]" the harassment of Plaintiff and decision to replace her as HR Director. *Feingold*, 366 F.3d at 158 (quoting *Tomka*, 66 F.3d at 1317). On the other hand, Plaintiff has failed to adduce sufficient evidence of Defendant Bulger's involvement in any of the conduct at issue in this case to create an issue of fact. There is, therefore, evidence from which a factfinder could conclude that Defendant Kusnierz, but not Defendant Bulger, aided and abetted discrimination and retaliation. Accordingly, Defendant Kusnierz is denied summary judgment on Plaintiff's remaining NYSHRL claims for aiding and abetting and Defendant Bulger is granted summary judgment.

### C.   § 1983 – Equal Protection – Discrimination

Finally, Defendant Kusnierz moves for summary judgment dismissing Plaintiff's § 1983 claim. (Dkt. No. 52-4, at 18). Plaintiff responds that triable issues of material fact preclude summary judgment. (Dkt. No. 58-3, at 49–52).

Claims of employment discrimination via §1983 are, like those brought under Title VII and the NYSHRL, analyzed under the *McDonnell Douglas* framework.[7] *See Hill*, 136 F. Supp. 3d at 331. The plaintiff must first establish a prima facie case of employment discrimination. *Hicks*, 509 U.S. at 506. To establish a prima facie case, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz*, 609 F.3d at 491–92. If the Plaintiff establishes a

---

[7] A plaintiff may bring a discrimination claim against an individual under § 1983, like the NYSHRL and unlike Title VII. *See Naumovski*, 934 F.3d at 212–13.

prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07. If the defendant does so, the plaintiff must then "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42.

The plaintiff must also show that the defendant acted under color of state law, *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A] plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law."), and was personally involved in the alleged violation, *Naumovski*, 934 F.3d at 212

### 1.    Color of State Law

As an initial matter, the parties do not seem to dispute that Defendant Kusnierz was a state actor and is therefore a proper defendant for purposes of a § 1983 claim. Indeed, it appears Defendant Kusnierz was "[a] state employee[] acting in [his] official capacity" during his interactions with Plaintiff and when, as a member of the County Board, he voted to replace Plaintiff as HR Director. *Feingold*, 366 F.3d at 159.

### 2.    Personal Involvement

"If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo*, 770 F.3d at 115 (emphasis in original). Thus, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 614 (2d Cir. 2020) (internal quotation marks and citation omitted).

Here, there is evidence from which a reasonable factfinder could infer that Defendant Kusnierz was personally involved in the decision not to reappoint Plaintiff to a second term as HR Director. Defendant Kusnierz voted in favor of the resolution appointing Mr. Chamberlain as

HR Director, (Dkt. No. 58-17, at 49–52), and Plaintiff has presented evidence that another Supervisor, Ms. Raymond, who also voted in favor of the resolution, told Plaintiff that she was "afraid to vote against Defendant [Kusnierz], and that she would not get any monies for her town if she did not vote with [him]," (Dkt. No. 58-2, ¶ 60). Mr. Peck testified that, at the time of the vote, he knew "[n]othing or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," (Dkt. No. 58-9, at 120:23–121:10). There is evidence that Defendant Kusnierz harassed Plaintiff for months prior to the vote, including by demanding her resignation. (Dkt. No. 58-9, at 72:1–4 (Mr. Peck testifying that when he stood up to conclude the meeting, "Kusnierz puts his speaker on and starts yelling into the microphone . . . pointing and screaming at Ms. McNamara . . . that he wanted her resignation")). And there is evidence that Defendant Kusnierz told Mr. Peck on August 18, 2020, that he was "going after [Plaintiff and Hellwig]." (Dkt. No. 58-9, at 108:22–23; *see also* Dkt. No. 58-19, at 34 (meeting minutes reflecting that Mr. Peck said that Defendant Kusnierz and others "want the [HR] Director . . . removed").

### 3.   Prima Facie Case

Plaintiff has satisfied the first and second factors because it is undisputed that as a woman, she is a member of a protected class, and that she was qualified to be HR Director. In addition, the failure to reappoint Plaintiff to a second term as HR Director is an adverse action. *See Zdziebloski v. Town of E. Greenbush, N.Y.*, 336 F. Supp. 2d 194, 203–04 (N.D.N.Y. 2004) (observing that "[n]ot rehiring a particular employee is an administrative personnel matter that involves no policy formulation," meaning that "the individual [d]efendants are not shielded by legislative immunity for that portion of [the plaintiff's § 1983] claim that concerns the failure to rehire him."). Therefore, the question is whether Plaintiff has presented any evidence that would permit an inference that the failure to reappoint her was attributable to gender discrimination.

Inference of discrimination is a "flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [the adverse employment action] occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-cv-1707, 2006 WL 2642415, at *14, 2006 U.S. Dist. LEXIS 68704, at *49 (D. Conn. Sept. 13, 2006). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in . . . degrading terms [related to a protected class]; or its invidious comments about others in the employee's protected group; . . . or the sequence of events leading" up to the adverse action. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotation marks omitted). An inference of discrimination can also arise from evidence "that an 'employer subjected [an employee] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.'" *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 372 (S.D.N.Y. 2013) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Here, Plaintiff has introduced evidence concerning Defendant Kusnierz's conduct leading up to the decision not to reappoint her as HR Director from which a reasonable factfinder could conclude that the decision was based on her gender. As the Court has discussed, Defendant Kusnierz singled Plaintiff out from her male counterparts to the press, (Dkt. No. 58-2, ¶¶ 16–17), and "went from calling her Director McNamara to calling her madame" when he questioned her at public meetings, (Dkt. No. 58-9, at 75:12–76:14). And several individuals have testified that Defendant Kusnierz's conduct toward Plaintiff was part of a broader pattern of hostile behavior

toward women. (*See, e.g.*, Dkt. No. 58-9, at 85:3–6 (Mr. Peck testifying that Defendant Kusnierz "was more aggressive with accomplished women than accomplished men."); Dkt. No. 58-10, at 44:5–6 (Mr. Hellwig testifying that "[t]here just seemed to be a trend with [Defendant Kusnierz] that related to females")). Plaintiff has also presented evidence that she was ultimately replaced as HR Director by a man at the end of a search and hiring process tinged with procedural irregularities. (*See* Dkt. No. 58-9, at 120:23–121:10 (Mr. Peck testifying that when the County Board voted on Resolution 2021-190, he knew "[n]othing or very little" about Mr. Chamberlain, "only that he was Kusnierz's guy," and that "[n]othing was being done the way we used to.")).

### 4. Legitimate Nondiscriminatory Reasons

As discussed previously, Defendant Kusnierz has adduced evidence of a legitimate, nondiscriminatory reason for not reappointing Plaintiff as HR Director, namely, her job performance and a belief that Mr. Chamberlain was well-suited for the role.

### 5. Pretext for Discrimination

As explained above, Plaintiff has presented sufficient evidence that Defendant Kusnierz's stated reason for replacing Plaintiff as HR Director is false or pretextual. Therefore, the Court concludes that a reasonable jury could find that but for Plaintiff's complaint against Defendant Kusnierz, Plaintiff would not have been replaced as HR Director.

### 6. Qualified Immunity

 Defendant Kusnierz argues that he is entitled to qualified immunity because his actions in voting for Mr. Chamberlain to replace Plaintiff as HR Director, "and any actions leading up to the vote, were objectively reasonable considering Plaintiff's history of poor performance in her role." (Dkt. No. 52-4, at 21). Plaintiff responds that "a reasonable fact finder could conclude that it was objectively unreasonable for [Defendant] Kusnierz to believe that he was acting in a fashion that did not violate [Plaintiff's] clearly established federal rights." (Dkt. No. 58-3, at 52).

Qualified immunity "is an affirmative defense on which [Defendants have] the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) 'whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'" *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

Here, there are material issues of fact as to whether Defendant Kusnierz's stated reason for replacing Plaintiff as HR Director is pretextual. Since factual issues remain that bear on the qualified immunity analysis, qualified immunity is precluded at this stage. *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004))); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

Consequently, summary judgment is denied as to Plaintiff's § 1983 claim against Defendant Kusnierz.

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motions for summary judgment, (Dkt. Nos. 51–53), are **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' motions for summary judgment, (Dkt. Nos. 51–53), with respect to Plaintiff's Title VII claims against the County Defendants for hostile work environment; NYSHRL claims against the County Defendants for harassment; NYSHRL claim against Defendant Kusnierz for aiding and abetting harassment; and NYSHRL claims against Defendant Bulger for aiding and abetting discrimination, harassment, and retaliation are **GRANTED** and these claims are **DISMISSED**; and it is further

**ORDERED** that the County Defendants and Defendant Kusnierz's motions for summary judgment, (Dkt. Nos. 51–52), are otherwise **DENIED**; and it is further

**ORDERED** that Defendant Bulger is **DISMISSED** as a Defendant and the Clerk is respectfully requested to terminate Bulger as a Defendant.

**IT IS SO ORDERED.**

Dated: September 12, 2024
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge